# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANICE CASOLO, | ) |
| Plaintiff, | ) Case No. 1:08-cv-281-SJM |
| v. | ) |
| CLARION SINTERED METALS, INC, *et al.*, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

This federal securities fraud action arises from a transaction occurring in 2005 whereby the Plaintiff, Janice Casolo, sold shares of Clarion Sintered Metals, Inc. ("CSM") stock back to the Company. Named as Defendants are CSM and its two controlling shareholders, Howard H. Peterson and Benjamin F. Marzella. In addition to seeking relief under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10(b)-5, 17 C.F.R. § 240.10b-5, Casolo has asserted state law claims of breach of fiduciary duty against the Defendants based on alleged acts of misrepresentation, oppression, and self-dealing. This Court's jurisdiction is premised upon 28 U.S.C. §§ 1331 and 1367.

Presently pending before the Court is the Defendants' motion for summary judgment [17] on all claims. For the reasons set forth below, this motion will be granted as to the federal securities fraud claim. The remaining state law claims will be dismissed without prejudice so that Plaintiff may pursue them in state court.

# I. STANDARD OF REVIEW

Summary judgment is proper only where the moving party has established "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "To demonstrate that no issue is in dispute as to any material fact, the moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). To survive the motion, the non-moving party must show specific facts such that a reasonable jury could find in its favor. *Id*. (*citing* former Fed.R.Civ.P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir.2005)) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). In adjudicating a Rule 56 motion, we view the underlying facts and all reasonable inferences arising therefrom in the light most favorable to the party opposing the motion – here, the Plaintiff. *McCabe*, 494 F.3d at 424; *Fasold v. Justice*, 409 F.3d 178, 180 (3d Cir.2005). With that standard in mind, we set forth the relevant facts of record.

# II. BACKGROUND

a) <u>The Company</u>

Casolo is a resident of Ridgway, Pennsylvania. Defendant CSM is a Pennsylvania corporation engaged in the business of producing structural powered metal components for the automotive, lawn and garden, appliance and industrial

markets. The company was formed in 1984 when Defendants Peterson and Marzella, along with three other individuals, purchased the assets formerly owned by International Powdered Metallurgy Company ("IPM"), a division of Thermco Systems, Inc.. Defendants Peterson and Marzella currently own more than eighty percent (80%) of CSM's stock and also serve as officers and directors of the Company.

Since its incorporation in 1984, CSM has maintained two classes of stock. "Class A" shares were sold to members of the public at a price of $10.00 per share. Among those who purchased Class A shares was Casolo's husband, who is now deceased. "Class B" shares, on the other hand, were sold to the five founding members of CSM, including Peterson and Marzella, at a price of $1.00 per share.

By early 1997, Peterson and Marzella had become the controlling shareholders of CSM and the only two remaining original holders of Class B shares. At some point that year, they incorporated an entity known as CSM Sales, Inc. (hereinafter, "CSM Sales"), a manufacturing representative firm ostensibly organized for the purpose of promoting the sales of CSM in return for a commission. As controlling shareholders of both companies, Peterson and Marzella caused CSM to enter into a contract with CSM Sales, Inc., pursuant to which CSM would pay as much as 7% of its total annual revenues to CSM Sales. Most of the money received by CSM Sales was distributed directly to Peterson and Marzella.

Although this contractual arrangement was supposedly intended to enhance CSM's sales and control its costs, in reality, Casolo claims, CSM Sales operated as a sham corporation with no business purpose in the sense that its transactions with CSM did not benefit CSM or its Class A shareholders. In this manner, it is alleged, Peterson

and Marzella were able to skim revenues from CSM, thereby diminishing the Company's profitability and avoiding the necessity of distributing such profits to minority shareholders. By Casolo's estimate, Peterson and Marzella have diverted more than $9 million of CSM's earnings to themselves since 1997.

Casolo claims that the Defendants perpetrated the foregoing scheme through surreptitious means. In 1997 the Company began to hold its annual shareholders' meeting at a more remote location in Erie, Pennsylvania rather than in Ridgway, where the Company is located. This move, Casolo posits, was intended to discourage the participation of minority shareholders like her husband.

That same year, Peterson and Marzella undertook the practice of withholding the annual audited financial statements of CSM from its shareholders. According to Casolo, this was significant because the audited financial statements contained information, under the topic "Related Party Transactions," which would have revealed the amounts of monies that Peterson and Marzella were transferring from the Company to CSM Sales, Inc. each fiscal year.

In lieu of the audited financial statements, CSM in 1997 began to issue "Condensed Financial Statements" to all Class A shareholders at the end of each fiscal year. These Condensed Financial Statements contained a basic balance sheet and income statement, but did not contain any explanation or text from the auditing accountant, and they revealed nothing about the existence of CSM Sales, Inc. or its relationship with CSM. Further, these Condensed Financial Statements were represented as having been prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). According to Casolo, that representation was false

because GAAP requires financial notes, such as those that identify "Related Party Transactions," to accompany any representation of the financial performance of the company. In other words, Casolo claims, GAAP required the disclosure on the Condensed Financial Statements of the relationship between CSM and CSM Sales, Inc., which did not occur.

Casolo has presented additional evidence suggesting that the Defendants sought to keep information concerning the relationship between CSM and CSM Sales hidden from its minority shareholders. Both Robert V. Howard, a former general manager and director of CSM, and Scott Gibson, a former controller and chief inside accountant for CSM, have indicated it was their understanding that the existence and workings of CSM Sales were confidential matters not to be discussed.

b) <u>The Shares</u>

On or about December 13, 1984, Plaintiff's husband, Joseph M. Casolo ("Joseph"), purchased 1500 shares CSM's Class A common stock for $15,000.00. Joseph was not employed at CSM but learned about the stock offering from his son-in-law's father, who also held stock in the Company. Casolo was not personally involved in the stock transaction because that was handled by Joseph. Casolo's involvement was limited to signing off on bonds that were sold in order to finance the stock purchase.

Years later, on January 24, 2005, Joseph died. Casolo believes that, following Joseph's death, she received a letter (or possibly a phone call, but "probably" a letter) instructing her to turn the stock back into the company by April of that year. (Casolo

Depo. [19-1] at p. 14-15, 28.) Casolo does not have a copy of this letter and cannot recall precisely when she received it, when she last possessed it, or whether she showed it to anyone. She is not sure who signed the letter. She cannot say definitively whether it was from anyone at CSM or whether it was presented on company letterhead. (*See generally id.* at 14-15, 22-23, 28-29.) She testified at her deposition that she "know[s] nothing about it" and "can't remember" these details. (*Id.* at 29.)

In any event, however, Casolo formed the impression that she was required to return her husband's stock to CSM before April of 2005. Accordingly, on April 15, 2005, she and her son Frank went to the Company's corporate offices and spoke with Defendant Marzella. Casolo's only memory of the discussion is that she "handed [Marzella] the stock" and "he gave me the check." (Casolo Depo. [19-1] at p. 16.) Nothing else was discussed that Casolo could remember, and neither she nor her son asked any questions in connection with the transaction. Although Casolo states that she would have preferred to hold on to the stock, she did not express that desire to Marzella.

In exchange for Joseph's 1500 Class A shares, Casolo received a corporate check in the amount of $88,365.00, representing $58.91 per share. Casolo had no idea what the stock would be worth prior to selling it back to the Company, and she found this out only when she received the check. She admits being pleasantly surprised by the amount she received, as she was not expecting so high a payment.

The stock certificates at issue contained a provision granting the Company the right of first refusal in the event the shareholder sought to transfer her shares. That provision read as follows:

> Before transferring these shares, the shareholder shall first offer these shares to the corporation, Clarion Sintered Metals, Incorporated, at the then fair market value and if the said corporation shall refuse to purchase them within 60 days of notification, the shareholder shall offer them to all remaining individual shareholders of this class in the order of the selling shareholder's choice at the then fair market value. Any shareholder accepting the offer shall have 30 days to pay the selling shareholder.

Casolo admits that she had never examined the certificates prior to selling them back to the Company, nor she did not consult an attorney in this regard. She was personally unaware of this right-of-first-refusal language on the date that she sold the stock, and she only learned of the provision for the first time at her deposition. Casolo never took any steps following Joseph's death to determine if the stock could be sold to third parties rather than to CSM.

The price which Casolo ultimately received for Joseph's stock – $58.91 per share – represented book value based upon the figures contained in the Condensed Financial Statements circulated to Class A shareholders. Casolo contends that this "book value" had been improperly manipulated by Peterson and Marzella as a result of their scheme to funnel millions of dollars of CSM revenues to themselves and thereby artificially suppress the value of the company's stock. At the time of the transaction in question, Casolo knew nothing of CSM Sales or its relationship with CSM. She had no idea, in particular, that CSM had paid approximately $9.5 million to CSM Sales during the years 1997 to 2007.

Casolo agrees that no one associated with CSM, including Marzella or Peterson, ever made any representations or statements to her concerning the value of his stock other than to convey the price that would be paid for the shares. Casolo is not

personally familiar with CSM and knew little about it other than the fact that Joseph had owned shares in the Company. She never had discussions with Joseph about the stock. Casolo had never attended shareholder meetings and did not believe Joseph had either. She had never reviewed any papers or financial statements from the Company and had no recollection of what Joseph might have reviewed. She never discussed the stock with him.

Moreover, Casolo has never discussed CSM or anything relating to the Company with the Defendants, with other company employees, or with anyone else at CSM. She has no information about Joseph ever having had such conversations either. Casolo has never reviewed any of the Company's financial statements or other paperwork and has never requested any corporate records. In fact, other than her somewhat vague recollection of having received the previously discussed "letter," Casolo never had any interaction at all with any representative of CSM prior to the date that she sold Joseph's shares back to the Company. With regard to the amount she was paid for Joseph's shares, Casolo does not recall any discussion about the manner in which the sales price was calculated. Instead, she relied on the Company's people to tell her what the value of the stock was.

Based on the foregoing facts, Defendants have moved for summary judgment on all of Casolo's state and federal claims. The issues have been briefed and argued and are now ripe for consideration.

## III. DISCUSSION

A.   Plaintiff's Federal Securities Fraud Claim

Casolo's first cause of action is premised upon alleged violations of Section 10(b) of the 1934 Securities Exchange Act and SEC Rule 10(b)(5). "Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the 'use or employ[ment] ... of any ... deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'" *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (*quoting* 15 U.S.C. § 78j(b)). "Commission Rule 10b-5 forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made ... not misleading.'" *Id*. (*quoting* 17 CFR § 240.10b-5 (2004)).

Courts have interpreted these provisions as providing a private cause of action to aggrieved investors who are harmed by materially false or misleading statements, and Congress has imposed statutory requirements on that private action. *Dura Pharmaceuticals, Inc.*, 544 U.S. at 341 (*citing by way of example* 15 U.S.C. § 78u-4(b)(4)). The Supreme Court has stated that, in cases involving publicly traded securities, the private right of action includes six "basic elements," *to wit*:

(1)   a material misrepresentation (or omission);
(2)   scienter, *i.e.*, a wrongful state of mind;
(3)   a connection with the purchase or sale of a security;
(4)   reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation";
(5)   economic loss; and

> (6) "loss causation," *i.e.*, a causal connection between the material misrepresentation and the loss.

*Dura Pharmaceuticals, Inc.*, *supra*, at 341. See also *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006).

Casolo contends that the Defendants falsely represented on their Condensed Financial Statements that the statements were compiled in accordance with Generally Accepted Accounting Principles when, in fact, the condensed financials failed to comply with GAAP in a significant way – *to wit*, there were no disclosures explaining the related-party transactions between the Company and CSM Sales, Inc., and there were no references whatsoever to any audited financial statements from which any such information was derived. According to Casolo, the Defendants were statutorily required under § 1554(a) of the Pennsylvania Business Corporation Law, 15 Pa. C.S.A. §1554(a), to provide this information.[1] By failing to disclose the related-party transactions between CSM and CSM Sales, Inc., Casolo claims, Defendants "methodically concealed the fact that they were using CSM Sales, Inc. as a conduit to divert substantial sums of money from the Company to themselves, while manipulating the book value of Class A shares." (Pl.'s Br. in Opp. to Defs.' Mot. for Summ. Judg. [27]

---

[1] Casolo maintains that, because Defendants prepared GAAP-compliant financial statements for the company's own internal use, § 1554(a) required them to provide this same GAAP-compliant information to their shareholders. Defendants dispute the Plaintiff's assertion that they were statutorily required to provide their shareholders with GAAP-compliant financial statements. For purposes of this Memorandum Opinion, we will assume only for the sake of discussion, without deciding, that such a statutory duty exists.

at p. 12.) Thus, Casolo contends, Defendants Peterson and Marzella had a duty, when she tendered his Class A shares, to provide GAAP compliant financial statements that adequately described the related-party transactions.

Defendants contend that Casolo's § 10b-5 claim fails as a matter of law because she cannot make the requisite showing of (a) fraudulent misrepresentation or omission, (b) scienter, (c) reliance/ transaction causation, and (d) loss causation.

The element of loss causation involves an exacting standard, as our Circuit Court of Appeals has explained:

> [t]o prove loss causation, the plaintiff must demonstrate "that the fraudulent misrepresentation actually caused the loss suffered." *Newton II* [*v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*] 259 F.3d [154] at 173 [(3d Cir. 2001)]. Similar to the concept of proximate cause in the tort context, loss causation focuses on whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff. *Suez Equity Investors [L.P., Sei Assocs. v. Toronto-Dominion Bank*], 250 F.3d [87] at 96 [(2d Cir. 2001)]. Thus, "[t]he loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement." *Id*. The United States Court of Appeals for the Seventh Circuit has succinctly explained that the loss causation element requires the plaintiff to prove "that it was the very facts about which the defendant lied which caused its injuries." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997) (*citing LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.1988)).

*Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006).

In the typical "fraud-on-the-market" §10(b) action, the plaintiff alleges that the price of a publicly traded security was artificially inflated as the result of a fraudulent misrepresentation or omission; in such cases, "to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a

substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *McCabe*, 494 F.3d at 425-26. In the "non-typical" case, where the plaintiff is not merely alleging that the price of a publicly traded security has been affected, "the factual predicates of loss causation fall into less of a rigid pattern." *Id*. at 426.

In either a "typical" or "non-typical" case, however, a plaintiff seeking to satisfy the loss causation requirement "must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *McCabe*, 494 F.3d at 426. *See also Berckeley*, 455 F.3d at 223 ("[A] plaintiff does not meet the loss causation element if he fails to prove that the drop in the value of a security is related to the alleged misrepresentation. ... In that situation, it cannot be said 'that the alleged misrepresentation proximately caused the decline in the security's value to satisfy the element of loss causation.").

We addressed this very principle previously in *Lindberg v. Clarion Sintered Metals, Inc.*, 711 F. Supp. 2d 458 (W.D. Pa. 2010), a case which, at least for purposes of determining "loss causation," is factually indistinguishable from the case at bar. In *Lindberg*, this Court stated the following:

> Here, it cannot be said that the allegedly fraudulent omission proximately caused the Plaintiff's economic loss. Lindberg contends that, at the time she undertook to sell her shares, the Defendants owed her a duty of full disclosure concerning the company's Related Party Transactions with CSM Sales. Yet the loss which Lindberg incurred -- namely, the artificial suppression of the book value of her stock shares, was not the result of the Defendants' failure to inform her of these Related Party Transactions; rather, it was the result of recurrent acts of alleged corporate malfeasance on the part of CSM's principles over the course of many years. Although disclosure of these transactions might have clued a minority shareholder like Lindberg in to the possible existence of corporate

> mismanagement, or even a potential breach of fiduciary duties, the failure to disclose did not itself account for the suppressed price of the company's Class A shares. Accordingly, Lindberg cannot establish loss causation as a result of the Defendant's allegedly fraudulent omission.

*Lindberg*, 711 F. Supp. 2d at 470.

Although Casolo concedes that *Lindberg* cannot be factually distinguished from the present case for purposes of conducting a "loss causation" analysis, she nevertheless urges the Court to reconsider its analysis in *Lindberg*. According to Casolo, this Court in *Lindberg* errantly focused on whether the allegedly fraudulent non-disclosure was the "mechanism" of the stock's devaluation, whereas, according to Casolo, the Court should have focused on whether the *subject matter* of the nondisclosure was the mechanism of the devaluation.

Casolo's position is that Defendants committed fraud by withholding copies of their own internal (and fully GAAP-compliant) financial statements, which Casolo insists Defendants were duty-bound to provide. But the most that these statements would have disclosed is the fact that, year after year, substantial sums of corporate monies were being paid to CSM Sales, a "related party." The GAAP-compliant statements themselves would not have revealed that CSM Sales was (as Casolo alleges) a "sham" corporation lacking any real business purpose or value to CSM and its shareholders. Yet proving the "sham" status of CSM Sales is a necessary predicate to establishing that the book value of CSM was being artificially suppressed. Thus, I do not agree that the alleged fraudulent omission can be shown to be the proximate cause of the stock's devaluation.

This point is indirectly proved by considering the actions Casolo claims should have been taken to avert any securities fraud. Casolo submits that, at the time of the April 7, 2006 stock sale, Defendants should have given her access to the Company's most recent GAAP-compliant financial statements, which would have covered the prior two fiscal years. Yet even providing Casolo this information could not have prevented her entire alleged loss. According to Casolo, the Defendants had been surreptitiously funneling money out of the Company on an annual basis since 1997. Providing her financial statements relative to the two prior fiscal years might have supplied her a basis to recover a part of her alleged economic loss, but not the entirety of it.

Again, this brings us back to the conclusion that the subject matter of the alleged fraudulent statements were the existence of CSM Sales, the fact that it was a "related party," and the fact that large sums of corporate cash had been funneled to this entity on an annual basis beginning in 1997. This is the only information which Casolo claims the Defendants were legally obligated to disclose. However, these facts, in and of themselves, did not cause Casolo's loss; rather, the loss was caused by Defendants' alleged breach of fiduciary duties in establishing and then funneling CSM monies into a corporate entity which, Casolo claims, was merely a sham entity.

Moreover, even if we were to adopt Casolo's analysis of loss causation, we would conclude that her federal securities claim is otherwise fatally flawed. The problem with Casolo's theory, no matter how we slice it, is that it inevitably conflates the concepts of reliance and loss causation.

Implicit in Casolo's securities fraud theory is her assumption that we should measure transaction causation (i.e., reliance) from the point at which Casolo decided to

sell her stock back to CSM for the price of $88,365.00.  As a logical matter, Casolo must make this assumption, because she cannot show transaction causation as of the date her husband originally purchased the CSM shares.  As of the original purchase date – approximately December 13, 1984 – the alleged fraud had not yet occurred; thus, no reliance on fraudulent statements or omissions could have occurred in connection with that end of the transaction.  Also, insofar as the April 15, 2005 stock sale is concerned, Casolo does not contend that, but for the alleged fraud, she would not have sold the stock.  (In fact, she admits that to forming a belief, albeit mistaken, that she was required to sell the stock back to the Company by the end of April 2005.)  Instead, Casolo seems to be implicitly claiming that, with the benefit of full disclosure, she would have demanded a higher sales price.  In short, Casolo's only theory for establishing transaction causation (i.e., reliance) is to show that, but for the Defendants' allegedly fraudulent omissions, she would not have sold his stock back to the Company *at the price for which it was sold*.

The problem with this theory is that the alleged inducement which forms the basis of Casolo's alleged transaction causation is also the very basis upon which she premises her alleged loss causation – i.e, the difference between the amount Casolo received from CSM versus what she would have received with the benefit of full disclosure.  As such, Casolo's theory impermissibly conflates the concepts of transaction causation and loss causation, which must each be found to exist independently of one another.  This is the problem of which we spoke in *Lindberg*:

> Lindberg appears to take the position, though, that her loss should be measured as the difference between what she was paid ($61,220, based on the stated book value of her stock at $61.22 per share) and the

> amount that she theoretically would have been paid according to the true book value of the stock, once all of the earnings improperly diverted from CSM were credited back to the company. She claims, in other words, that, because of the alleged fraudulent omission, she was induced to sell her stock at an artificially low price. However, this measure of loss- i.e., Lindberg's claim that the Defendants' omission prevented her from holding out for a higher share price-essentially conflates her stated theories of causation loss and transaction loss. Our Circuit Court of Appeals has stressed the fact that both loss causation and transaction causation must be established for a § 10(b) claim and the two concepts cannot be conflated. *See McCabe*, 494 F.3d at 429-30 (plaintiffs' attempt to demonstrate loss causation by showing that they were induced into the subject transaction by the defendant's allegedly fraudulent omission "impermissibly conflate[d] loss causation with transaction causation, rendering the loss causation requirement meaningless").

711 F. Supp. 2d at 470. *See also Roll v. Singhi,* Civil Action No. 07–cv–04136 (FLW), 2008 WL 3413863 at *12 (D.N.J. June 26, 2008) ("[I]n *McCabe,* the Third Circuit unequivocally held that loss causation is a separate and independent element apart from transactional causation and that it applies in both the typical (misrepresentations or omissions regarding publicly traded stock, i.e.—fraud on the market) and non-typical (misrepresentations or omissions that induced another party into entering a private transaction) securities fraud action. Thus, this Court must address each element separately.").

Because we conclude that Casolo cannot establish the separate elements of transaction causation and loss causation, her federal securities claim fails as a matter of law. Accordingly, Defendants are entitled to summary judgment on this claim.

B. <u>Plaintiff's State Law Claims</u>

Casolo has also asserted claims under Pennsylvania law for breach of fiduciary duty based on the Defendants' alleged acts of misrepresentation, oppression, and self-

dealing. As the parties here are not diverse for purposes of 28 U.S.C. § 1332, the Court's sole basis of jurisdiction over these claim is 28 U.S.C. § 1367, which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." *Id*. at § 1367(c)(3). *See Elkadrawy v. Vanguard Group, Inc.*, 584 F.3d 169, 174 (3d Cir. 2009) (once the District Court dismissed the plaintiff's federal claims, leaving only the state claim, the prerequisites for § 1367(c)(3) were met). Accordingly, this Court declines to exercise supplemental jurisdiction over the remaining breach of fiduciary duty claims and those causes of action will be dismissed without prejudice.

### IV. CONCLUSION

Based upon the foregoing reasons, the Defendants' motion for summary judgment will be granted with respect to the Plaintiff's claim premised on alleged violations of the federal Securities Exchange Act of 1934 § 10(b) and SEC Rule 10(b)-5. The motion will be denied with respect to Plaintiff's remaining state law claims premised on the Defendants' alleged breach of fiduciary duty, and those state law claims will be dismissed without prejudice. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANICE CASOLO, | ) |
| Plaintiff, | ) |
| | ) Case No. 1:08-cv-281-SJM |
| v. | ) |
| | ) |
| CLARION SINTERED METALS, INC., *et al.*, | ) |

## ORDER OF JUDGMENT

AND NOW, *to wit*, this 30th day of September, 2011, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS ORDERED that the Defendants' Motion for Summary Judgment [17] be, and hereby is, GRANTED in part and DENIED in part as follows:

1. Said motion is GRANTED insofar as it relates to Plaintiff's federal claim premised upon alleged violations of the Securities Exchange Act of 1934 § 10(b) and SEC Rule 10(b)-5. As to this claim, JUDGMENT shall be, and hereby is, entered in favor of Defendants Clarion Sintered Metals, Inc., Howard H. Peterson, and Benjamin F. Marzella and against Plaintiff Janice Casolo.

2. Said motion is DENIED insofar as it relates to Plaintiff's state law claims for breach of fiduciary duty premised upon alleged acts of oppression, misrepresentation, and self-dealing.

IT IS FURTHER ORDERED that Plaintiff's state law claims asserting breach of fiduciary duty be, and hereby are, DISMISSED WITHOUT PREJUDICE.

SEAN J. McLAUGHLIN

Sean J. McLaughlin
United States District Judge

cc: All counsel of record.